**ELGIN-BUTLER BRICK COMPANY**
v.
**UNITED STATES of America.**
Civ. A. No. 856.

United States District Court
W. D. Texas, Austin Division.
Nov. 14, 1956.

Joseph B. Brennan, Atlanta, Ga., Willis B. Snell, Washington, D. C., Jay H. Brown, Frank C. Erwin, Jr., Austin, Tex., Sutherland, Asbill & Brennan, Atlanta, Ga., Hart, Brown, Sparks & Erwin, Austin, Tex., for plaintiff.

Charles K. Rice, Asst. Atty. Gen., Andrew D. Sharpe, David W. Richter, Gerald J. O'Brien, Attys., Dept. of Justice, Washington, D. C., Russell B. Wine, U. S. Atty., San Antonio, Tex., for defendant.

RICE, Chief Judge.

This suit is for the recovery of income tax and interest thereon heretofore assessed against, and collected from, plaintiff by defendant for plaintiff's taxable years 1951, 1952, and 1953, and is brought pursuant to the provisions of Section 1346(a) (1) of Title 28 of the United States Code, Act of June 25, 1948, c. 646, 62 Stat. 869, as amended by the Act of July 30, 1954, c. 648, sec. 1, 68 Stat. 589.

The suit arises under the provisions of the Internal Revenue Code of 1939, 26 U.S.C. Section 114(b) (4) (A) provides that in the case of certain specified mines and natural deposits, the allowance for depletion under Section 23 (m) is to be computed as a percentage of "gross income from the property," limited to fifty percent (50%) of the "net income * * * (computed without allowance for depletion) from the property." Section 114(b) (4) (B) defines "'gross income from the property'" as "gross income from mining," and then lays down the rule that:

"The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, * * *."

The question involved in this case is whether the processes which plaintiff applies to its refractory and fire clay in order to obtain the burnt clay products that it sells to its customers, are "the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products," within the meaning of Section 114(b) (4) (B) of the Internal Revenue Code of 1939.

The case was tried before the Court without a jury, following which the parties submitted written briefs.

The Court, having fully considered the pleadings, the evidence, and the written briefs submitted by the parties, makes and enters the following Findings of Fact and Conclusions of Law, all of which Findings and Conclusions are applicable to each of plaintiff's taxable years 1951, 1952, and 1953, unless otherwise expressly indicated:

### Findings of Fact

#### I.

Plaintiff is a corporation organized and existing under the laws of the State of Texas. It has its principal place of business in the City of Austin, Travis County, Texas, which is within the above mentioned District and Division of this Court.

#### II.

This action is brought pursuant to the provisions of Section 1346(a) (1) of Title 28 of the United States Code, Act of June 25, 1948, c. 646, 62 Stat. 869, as amended by the Act of July 30, 1954, c. 648, sec. 1, 68 Stat. 589, and is for the recovery of income tax and interest thereon heretofore assessed against, and collected from, plaintiff by defendant for plaintiff's taxable years 1951, 1952 and 1953.

#### III.

Plaintiff keeps its books upon a calendar year basis and upon an accrual basis method of accounting.

## IV.

1. Plaintiff owns and operates a clay pit located in Bastrop County, Texas, near the Town of Elgin and about 30 miles East of the City of Austin.

2. Plaintiff is engaged in the business of extracting clay from said pit and making burnt clay products from such clay in a plant which adjoins the pit.

3. All of the clay which plaintiff extracts from its pit has a "P. C. E." (i. e., "pyrometric cone equivalent") of 26 or higher and is suitable for use in making fire brick and other refractory products.

4. All of the clay which plaintiff extracts from its pit is "refractory and fire clay," and said pit is a natural deposit of "refractory and fire clay."

5. Plaintiff's "refractory and fire clay" is a "mineral" and is not an "ore."

6. Except for such negligible quantity of its clay as plaintiff is able to sell before the clay is put in the form of burnt clay products, all of the clay that plaintiff extracts from its pit is used in making plaintiff's burnt clay products, and all of the clay which plaintiff uses in making said burnt clay products comes from plaintiff's pit and from no other source.

7. In general, the burnt clay products which plaintiff makes from its clay consist of fire brick, glazed structural facing tile, unglazed structural facing tile, and face brick.

8. All of the burnt clay products that plaintiff makes from its clay are "mineral products."

## V.

In order to obtain its aforesaid burnt clay products, plaintiff applies the following processes to the clay which it extracts from its pit:

1. The clay is extracted from the pit by the use of a power-driven shovel, a caterpillar tractor and large vehicular scoops.

2. The clay is then loaded into large earth-carrying vehicles which transport it from the pit to the plant. (At this point in the processing, the clay is called "raw clay.")

3. Upon arrival at the plant, the clay is dumped into a primary crusher which reduces the large chunks of clay to about the size of a man's clenched fist.

4. The clay is carried on a conveyor belt from the primary crusher to the clayshed stockpile into which it is discharged.

5. As needed, the clay is removed from the clayshed stockpile by vehicular scoops and is dumped into a vibrating feeder hopper.

6. The clay is carried on a conveyor belt from the vibrating feeder hopper to a dry pan crusher wherein the clay is further ground and mixed.

7. From the dry pan crusher the clay is moved by a bucket elevator onto vibrating screens, and the clay which will not pass through those screens is returned to the dry pan crusher for additional grinding.

8. The clay which passes through the vibrating screens is deposited in the ground clay storage bin. (At this point in the processing, the clay is called "ground clay.")

9. As needed, the clay is taken from the ground clay storage bin through a chute and is moulded into the desired size and shape, either by the use of a dry press process or by the use of a pugmill-extrusion process.

a. In the dry press process, the clay from the ground clay storage bin is machine-moulded into the desired size and shape by means of mechanical pressure alone and without any further preparation of the clay.

b. In the pugmill-extrusion process:

(1) The clay from the ground clay storage bin is mixed with water.

(2) Air is evacuated from the clay by the use of a vacuum pump.

(3) The clay is forced under pressure through a series of dies and is extruded in a continuous ribbon in the desired shape.

(4) The moulded ribbon of clay is cut into units of the desired length.

(5) The clay units are placed in drying rooms where free water is evaporated from them.

(6) The clay units which are to have impervious surfaces are sprayed with a liquid compound.

10. The clay units are burned in either a periodic or continuous (tunnel) kiln.

a. Where a periodic kiln is used:

(1) The clay units are stacked by hand in the kiln and the kiln is sealed.

(2) Heat is introduced until the temperature in the kiln reaches the proper height for the necessary period of time.

(3) The kiln is allowed to cool and the burnt clay units are removed from the kiln by hand.

b. Where a continuous (tunnel) kiln is used:

(1) The clay units are stacked on cars which operate on rails running through the long tunnel-like kiln.

(2) As the car loaded with clay units passes through the long kiln, it travels through a series of chambers in which the temperatures are consecutively higher until the proper heat is applied for the necessary period of time, and then it travels through a series of chambers in which the temperatures are consecutively lower until the clay units are cool when they emerge from the kiln.

11. After being burned, the clay units are loaded at the plant for shipment by truck or railroad to plaintiff's customers.

### VI.

Plaintiff's processes Nos. 1 through 11, inclusive, (described hereinabove in paragraph V of these Findings of Fact) are the ordinary and usual ones by which refractory and fire clay generally and normally is extracted from the ground and processed into burnt clay products.

### VII.

1. Before the clay which plaintiff extracts from its pit is put in the form of burnt clay products, plaintiff is able to sell less than one percent (1%) of such clay.

2. Before the clay which plaintiff extracts from its pit is put in the form of burnt clay products, plaintiff has no opportunity to sell more than a negligible quantity of such clay.

3. Before their clay is put in the form of burnt clay products, refractory and fire clay mine owners and operators in plaintiff's market area have no opportunity to sell more than a negligible quantity of their refractory and fire clay.

4. In the United States as a whole, more than seventy-five percent (75%) of the refractory and fire clay which is extracted from the ground has to be put in the form of burnt clay products before it can be sold.

5. In the United States as a whole, more than ninety percent (90%) of the refractory and fire clay mine owners and operators are required to put their refractory and fire clay in the form of burnt clay products in order to be able to sell such clay.

6. Both in plaintiff's market area and in the United States as a whole, refractory and fire clay mine owners and operators normally are required to put their refractory and fire clay in the form of burnt clay products in order to obtain products which are commercially marketable.

### VIII.

1. During plaintiff's taxable years in question, the amounts of clay which plaintiff extracted from its pit, and the amounts of such clay that plaintiff was able to sell before the clay was put in the form of burnt clay products, were as follows:

| Year | Total Tons of Clay Extracted | Tons of "Raw Clay" Sold | Tons of "Ground Clay" Sold |
|------|------|------|------|
| 1951 | 48,693 | (None) | 176 |
| 1952 | 47,087 | (None) | 219 |
| 1953 | 48,860 | 510 | 208 |

2. During plaintiff's taxable years in question, plaintiff sold in the form of "raw clay" (obtained by the application of the first two of plaintiff's processes described hereinabove in paragraph V of these Findings of Fact) and "ground clay" (obtained by the application of the first eight of plaintiff's processes described hereinabove in paragraph V of these Findings of Fact) all of its clay that it had an opportunity to sell before such clay was put in the form of burnt clay products.

3. During plaintiff's taxable years in question, plaintiff's only opportunity to sell its "ground clay" was in 100-pound sacks for use as mortar mix in laying up fire brick and other burnt refractory products, the prices at which plaintiff sold such negligible quantities of its "ground clay" as it had an opportunity to sell were as follows:

| 1951 | 1952 | 1953 |
|---|---|---|
| $20.35 per ton | $20.35 per ton | $23.50 per ton, |

and said selling prices were the prevailing selling prices in plaintiff's market area for such negligible quantities of comparable "ground clay" as there was opportunity to sell in that area.

4. During plaintiff's taxable years in question, plaintiff had opportunity to make only one isolated sale of its "raw clay." Said sale was made in 1953 and consisted of 510 tons of "raw clay" sold at a price of $7 per ton to a burnt clay products plant in Mexico as an accommodation to the owner of said plant in connection with certain experiments which said owner was making with burnt clay tile.

5. For plaintiff's taxable years in question, plaintiff's sales (f. o. b. its plant, loaded for shipment) of the clay which it extracted from its pit were as follows (tabulated according to the form in which such clay was sold):

| | 1951 | 1952 | 1953 |
|---|---|---|---|
| Burnt Clay Products | $1,544,645.67 | $1,186,777.66 | $1,327,054.56 |
| "Ground Clay" | 3,581.60 | 4,456.65 | 4,888.00 |
| "Raw Clay" | (None) | (None) | 3,570.00 |
| Total Sales | $1,548,227.27 | $1,191,234.31 | $1,335.512.56 |

6. For plaintiff's taxable years in question, plaintiff's "net income (computed without allowance for depletion) from the property" was as follows:

| 1951 | 1952 | 1953 |
|---|---|---|
| $470,489.80 | $160,969.12 | $214,750.06 |

7. For plaintiff's taxable years in question, defendant allowed, and used as the basis for computing the income tax and interest thereon which defendant has heretofore assessed against, and collected from, plaintiff, depletion deductions for plaintiff as follows:

| 1951 | 1952 | 1953 |
|---|---|---|
| $41,355.43 | $28,535.56 | $39,911.29 |

8. For plaintiff's taxable years in question, when plaintiff's depletion deductions are computed on the basis of 15% of plaintiff's sales (f. o. b. its plant, loaded for shipment) of the burnt clay products that plaintiff made from its clay, plus 15% of plaintiff's sales (f. o. b.

its plant, loaded for shipment) of the negligible quantity of its clay that plaintiff was able to sell before the clay was put in the form of burnt clay products, limited to 50% of plaintiff's "net income (computed without allowance for depletion) from the property," the depletion deductions which defendant should have allowed plaintiff, and should have used as the basis for computing the income tax and interest thereon which defendant assessed against, and collected from, plaintiff, are as follows:

| 1951 | 1952 | 1953 |
|------|------|------|
| $232,234.09 | $80,484.56 | $107,375.03 |

9. For plaintiff's taxable years in question, defendant has heretofore assessed against, and collected from, plaintiff the following income tax and interest thereon:

| Year | Tax | Interest |
|------|------|----------|
| 1951 | $216,013.04 | $ 383.96 |
| 1952 | 67,700.74 | 2,862.85 |
| 1953 | 92,517.89 | 1,430.35 |

10. For plaintiff's taxable years in question, when plaintiff's depletion deductions are computed on the basis of 15% of plaintiff's sales (f. o. b. its plant, loaded for shipment) of the burnt clay products that plaintiff made from its clay, plus 15% of plaintiff's sales (f. o. b. its plant, loaded for shipment) of the negligible quantity of its clay that plaintiff was able to sell before the clay was put in the form of burnt clay products, limited to 50% of plaintiff's "net income (computed without allowance for depletion) from the property," the income tax and interest thereon which defendant should have assessed against, and collected from, plaintiff are as follows:

| Year | Tax | Interest |
|------|------|----------|
| 1951 | $119,142.12 | (None) |
| 1952 | 40,687.26 | $ 248.79 |
| 1953 | 57,436.75 | 141.68 |

IX.

For each of plaintiff's taxable years 1951, 1952, and 1953:

1. Plaintiff timely filed its federal income tax return and timely paid the tax liability shown as due thereon.

2. Plaintiff timely paid the income tax deficiency and interest thereon assessed against plaintiff by defendant.

3. Plaintiff timely filed its Claim for Refund covering the income tax and interest thereon for which plaintiff sues herein, and said Claim for Refund set forth the grounds upon which this suit is based.

4. Plaintiff's Claim for Refund was disallowed by defendant prior to the filing of this suit, and thereafter this suit was filed within the time permitted by law.

Conclusions of Law

I.

This Court has jurisdiction of both the parties and the subject matter in this case, and all of the procedural requirements for the bringing of this suit have been met.

II.

1. Plaintiff's processes Nos. 1 and 2 (of the 11 processes described hereinabove in paragraph V of the Findings of Fact) constitute "the extraction of the minerals from the ground" within the meaning of Section 114(b) (4) (B) of the Internal Revenue Code of 1939.

2. Plaintiff's processes Nos. 3 through 11, inclusive, (of the 11 processes described hereinabove in paragraph V of the Findings of Fact) are "the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products," within the meaning of Section 114(b) (4) (B) of the Internal Revenue Code of 1939.

III.

All of the clay which plaintiff extracts from its pit is "refractory and fire clay," and said pit is a natural deposit of "refractory and fire clay," within

the meaning of Section 114(b) (4) (A) of the Internal Revenue Code of 1939, and, therefore, under the 1939 Code plaintiff is entitled to a depletion deduction for said clay pit computed at the rate of fifteen percent (15%) of plaintiff's "gross income from the property," limited to fifty percent (50%) of its "net income * * * (computed without allowance for depletion) from the property."

#### IV.

■ Plaintiff's "gross income from the property" is plaintiff's sales (f. o. b. its plant, loaded for shipment) of the burnt clay products that plaintiff makes from its clay, plus plaintiff's sales (f. o. b. its plant, loaded for shipment) of the negligible quantity of its clay that plaintiff is able to sell before the clay is put in the form of burnt clay products.

#### V.

■ Plaintiff is entitled to a depletion deduction equal to 15% of plaintiff's sales (f. o. b. its plant, loaded for shipment) of the burnt clay products that plaintiff makes from its clay, plus 15% of plaintiff's sales (f. o. b. its plant, loaded for shipment) of the negligible quantity of its clay that plaintiff is able to sell before the clay is put in the form of burnt clay products, limited to 50% of plaintiff's "net income * * * (computed without allowance for depletion) from the property."

#### VI.

Plaintiff has overpaid its income tax and is entitled to recover from defendant the following amounts of income tax and interest thereon heretofore assessed against, and collected from, plaintiff by defendant:

| Year | Tax | Interest |
| --- | --- | --- |
| 1951 | $96,870.92 | $ 383.96 |
| 1952 | 27,013.48 | 2,614.06 |
| 1953 | 35,081.14 | 1,288.67, |

with interest thereon from the dates of payment thereof, as provided by law, together with all allowable costs of suit expended by plaintiff herein.